LEONA A. DONOVAN v. L. C. DIXON AND OTHERS.
WILLIAM LAWIN AND OTHERS, APPELLANTS.

113 N. W. (2d) 432.

January 12, 1962—No. 38,244.

*King & Flora,* for appellants.
*Bradford & Kennedy,* for respondent.

NELSON, JUSTICE.

Action by Leona A. Donovan to recover damages for sale of guaranty fund certificates issued by Consumers Mutual Insurance Company, a corporation, pursuant to Minn. St. 66.08. The certificates were not registered with the Securities Commission.

The plaintiff worked for said company at St. Paul from January 17, 1953, until March 7, 1953. At that time its offices were moved to Long Prairie, Minnesota, and she continued to work for it there. This action was brought against L. C. Dixon, LeRoy Dixon, and Dewert Gruening, directors and respectively president, secretary, and treasurer of said company, and against William Lawin, Arthur Lawin, Donald Hart, Arnold Griep, F. E. Houle, and N. D. Underhill, also directors. Upon the findings of a jury, judgment was ordered by the trial court against L. C. Dixon, LeRoy Dixon, William Lawin, Arthur Lawin, Donald Hart, F. E. Houle, and N. D. Underhill.[1] All of said defendants except L. C. Dixon and LeRoy Dixon appeal from the judgment.

Plaintiff, after coming to Long Prairie, was placed in charge of the underwriting department, which made out policies and endorsements, figured rates and premiums, and calculated risks. She continued in the employ of the company in that capacity until March 12, 1959, when the business of the company was being liquidated.

---

[1]The court directed a verdict in favor of defendant Arnold Griep and defendant Dewert Gruening apparently was not served.

During the year 1953 plaintiff was informed that the company needed working capital. L. C. Dixon, then president, explained to her that the company was growing by leaps and bounds and had a surplus "upwards of" $75,000 and that if she were to invest in the guaranty fund certificates they were about to issue, it would be as sound as putting money in the bank.

Plaintiff told L. C. Dixon that she had some money available for investment but planned to buy a house as soon as her daughter no longer needed a baby sitter. She claims that he promised her that if she invested in guaranty fund certificates of the company he would personally see to it that she could withdraw her money at any time she saw fit and receive interest at 5 percent per annum. Upon these and other representations, plaintiff invested $7,500 in guaranty fund certificates. This sale was acquiesced in generally by the board of directors.

Some time later plaintiff demanded her money back and gave L. C. Dixon 2 weeks in which to pay her the interest which had accumulated on the certificates. He paid her $225 interest in response to her demand and sold the first $500 of her investment. She made no further demands after being informed by Frank L. King, then a member of the board of directors, that her investment was a fixed asset and could not be returned until there was a market for her certificates. Later when the company was liquidated due to impaired capital plaintiff brought this suit, alleging that the issuance and sale of the certificates were illegal and not within the authority granted by Minn. St. c. 66 and that the defendants were negligent in the sale of the certificates and in permitting it when they knew or should have known that the financial condition of the corporation did not justify the issuance of said certificates.

The trial court submitted a special verdict to the jury for their consideration, explaining it in his instructions. This verdict was as follows:

"As To The Fraud Count

"1. Did the defendant, L. C. Dixon, make a false representation or representations of material facts, knowing such representation or rep-

resentations to be false, or as of his own knowledge without knowing whether such representation or representations were true or false, with the intention to induce plaintiff to act in reliance thereon?

"Answer yes or no—Yes.

"2. If your answer to the foregoing interrogatory is yes, then answer the following interrogatory: Did plaintiff rely upon such representation or representations in purchasing certificates?

"Answer yes or no—Yes.

"3. If your answer to the foregoing interrogatory is yes, then answer the interrogatory: Did the plaintiff thereafter ratify and confirm the transaction and waive any and all fraud?

"Answer yes or no—No.

### "As To Promise To Repay Principal And Interest

"4. Did L. C. Dixon promise plaintiff that he would pay her interest on the money paid for the guaranty fund surplus certificates?

"Answer yes or no—Yes.

"5. Did defendant L. C. Dixon promise plaintiff that he would repay the principal of her investment on her demand?

"Answer yes or no—Yes.

### "As To Confidential Relationship

"6. Did a confidential relationship exist between the plaintiff and L. C. Dixon, such as to repose confidence and trust in him and reliance upon statements made to her negligently and carelessly omitting to disclose to plaintiff certain material facts relating to guaranty fund certificates?

"Answer yes or no—Yes.

"7. If answer is yes to last question, did plaintiff rely upon and was she deceived thereby?

"Answer yes or no—Yes.

"8. If answer is yes to last question did plaintiff nevertheless assume the risk of her investment?

"Answer yes or no—No.

"AS TO NEGLIGENCE

"9.   Was the defendant, L. C. Dixon, negligent in the sale of guaranty fund certificates to plaintiff?

"Answer yes or no—Yes.

"10.   If your answer to the last question is yes was such negligence a proximate cause of plaintiff's loss?

"Answer yes or no—Yes.

"11.   Were the defendants LeRoy Dixon, William Lawin, Arthur Lawin, Arnold [sic] Hart, F. E. Houle and N. D. Underhill negligent in the sale of guaranty fund certificates to plaintiff?

"Answer yes or no—Yes.

"(Written in by jury: LeRoy Dixon, Wm. Lawin, N. D. Underhill).

"12.   If your answer to last question is yes was such negligence a proximate cause of plaintiff's loss?

"Answer yes or no—Yes.

"AS TO PARTICIPATION

"13.   The Court having determined that in so far as L. C. Dixon, LeRoy Dixon and William Lawin are concerned, they did aid and participate in the sale of guaranty fund surplus certificates to plaintiff, and the Court having also determined as to all defendants that they did aid and participate in the sale of guaranty fund surplus certificates generally, the following question is submitted for answer by the jury:

"13.   Were the defendants, Arthur Lawin, Donald Hart, F. E. Houle and N. D. Underhill aware of the sale of guaranty fund certificates at, the time of, or prior to, or within   a reasonable time thereafter to the plaintiff?

"Answer yes or no—Yes."

Upon return of the jury verdict, the trial court ruled that the guaranty fund certificates were securities within the provisions of Minn. St. c. 80; that they were sold without being registered; that all of the defendants aided and participated in the sale of certificates to plain-

tiff; and that plaintiff was entitled to recover against all of the defendants. It ordered judgment entered accordingly.

Appellants raise the following issues on appeal:

(1) Did the court err in denying the motion for summary judgment of dismissal on the ground that the guaranty fund certificates were not securities within the statutes requiring the registration of securities?

(2) Did the court err in finding that William Lawin aided and participated in the sale of the guaranty fund certificates to plaintiff?

(3) Did the court err in finding that all of the appellants aided and participated in the sale of guaranty fund certificates generally?

(4) Did the court err in submitting to the jury the question: "Were the defendants, Arthur Lawin, Donald Hart, F. E. Houle and N. D. Underhill aware of the sale of guaranty fund certificates at the time of, or prior to, or within a reasonable time thereafter to the plaintiff?"

Essentially appellants contend that the guaranty fund certificates as a matter of law are not securities and that they are not liable because they did not participate in the sale to the plaintiff.

Since there has been no motion for a new trial and the appeal is from the judgment, the only question before this court is whether the lower court's findings, some of which were based upon the special verdict, are sustained by the evidence.

■ Upon appeal from the judgment, since no motion was made for a new trial, we are concerned first with whether the evidence sustained the jury's special verdict and the trial court's findings. It was for the triers of fact to resolve the conflicts in the testimony, and it is for this court to determine whether the findings support the conclusions of law and the judgment.

■ It is well settled in this jurisdiction that the findings of fact by a trial court or jury will not be reversed on appeal unless manifestly and palpably contrary to the evidence and that this rule applies whether the appeal is from a judgment or from an order granting or denying a new trial. See, State v. McCoy, 228 Minn. 420, 38 N. W. (2d) 386; Holz v. Pearson, 229 Minn. 395, 39 N. W. (2d) 867; Boulevard Plaza Corp. v. Campbell, 254 Minn. 123, 137, 94 N. W. (2d) 273,

284; Loth v. Loth, 227 Minn. 387, 35 N. W. (2d) 542, 6 A. L. R. (2d) 176; 1 Dunnell, Dig. (3 ed.) § 415.

This court will consider the testimony in the light most favorable to the prevailing party and if the evidence as a whole tends to support the findings they will not be disturbed. The findings of fact by the jury and trial court stand on an equal footing and are entitled to the same weight and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence.

A search of the record in the instant case would support the conclusion that the appellants, as directors, either authorized or participated in the sale of guaranty fund certificates to the plaintiff. The trial court determined that L. C. Dixon, LeRoy Dixon, and William Lawin aided and participated in sales to plaintiff. Based upon the jury's finding that the other appellants also were aware of the sale to plaintiff before, at the time of, or within a reasonable time after its making, the court determined that each aided and participated in the sale. A reading of the record indicates support for the findings of fact, conclusions of law, and order for judgment.

In Drees v. Minnesota Petroleum Co. 189 Minn. 608, 250 N. W. 563, this court held that an officer of a corporation aiding and participating in the illegal sale of stock or securities of his corporation is liable to the purchaser for the money paid therefor and that no rescission or tender back of the stock so purchased was necessary before bringing suit where the purchaser received only a void paper certificate of stock. This court held that the action was not one in quasi-contract for recovery of money had and received by the corporation on an implied promise to repay, but for recovery on the ground of tort; this court further held that the evidence conclusively showed that the stock of the defendant corporation was sold in this state in violation of the statute requiring that such stock be registered and sale thereof licensed or approved by the state securities commission, and also that it conclusively appeared that the treasurer and the president aided and participated in the sales of such stocks to plaintiffs.

In the instant case the Midland Mutual Fire Insurance Company with its principal place of business at Minneapolis was incorporated in

1936 under Mason St. 1927, §§ 3535, 3536, to engage in the business of insuring its members on the mutual plan against loss by fire and lightning. In 1942 the principal place of business was changed to St. Paul. The name was changed to Consumers Mutual Insurance Company in 1946. The offices were moved to Long Prairie in 1953. The corporate articles vested management in a board of directors elected by the policyholders from among their number. A policyholder was a member, entitled to one vote for each policy pursuant to Minn. St. 66.01, and could be assessed for payment of losses and expenses if net assets were insufficient (§ 66.07).

Section 66.09 provides that a mutual insurance company may issue nonassessable policies if it establishes and maintains, over and above its liabilities and the reserves required by law of a like stock insurance company, a guaranty fund available for the payment of losses and expenses at least equal to the capital stock and surplus, if any, required of a like stock insurance company. That section also provides that the guaranty fund may be created either by transferring funds from existing surplus into such fund or by the issuance of guaranty fund certificates "as specified in section 66.12, the same to be issued upon the conditions and subject to the rights and obligations specified in section 66.12."

Consumers Mutual had been writing only assessable policies, no guaranty fund having previously been provided for. The minutes of the company show that the first use of surplus certificates was to raise $7,500 in order to provide a surplus of $10,000 to permit insuring and that the sales of the certificates to plaintiff and other sales made in 1953 and 1954 were for the purpose of raising capital. At a meeting March 25, 1953, a motion that the capitalization of the company be increased to $200,000 was adopted. L. C. Dixon, who became president of the company a few months later, testified:

"Q. So that when you made the motion to increase to $200,000.00 the capitalization you meant to issue and sell guaranty funds certificates?

"A. Yes.

\* \* \* \* \*

"Q. Including those [certificates] that were issued eventually to Leona Donovan?

"A. Yes."

Thus, from the first sale of guaranty fund certificates to the last, the purpose was to provide working funds—surplus originally and ordinary working capital thereafter.

At a board meeting September 12, 1950, a resolution had been passed authorizing the president and secretary to issue "Guaranty Surplus Certificates" to the value of $50,000. Defendants Underhill and William Lawin were elected directors and LeRoy Dixon was elected director and secretary at that meeting. The record further indicates that at a board meeting October 17, 1950, at which Underhill and William Lawin were present, the minutes of the September 12, 1950, meeting were read and approved.

At a board meeting held April 5, 1951, at which Underhill and William Lawin were present, Underhill was elected vice president and William Lawin assistant secretary. The following resolution was adopted:

"Upon motion duly made by Mr. Underhill, seconded by Mr. Lawin and carried, it was resolved that any future issuing of Surplus Certificates be approved by the Board of Directors."

This resolution was never amended nor rescinded.

At a meeting on June 27, 1951:

"It was moved by Mr. Lawin, seconded by Mr. Bretz and carried, to increase the amount of Guaranty surplus certificates of this company up to $100,000.00 drawing interest at 5%. per annum."

At a board meeting December 31, 1951, Underhill was elected president.

At a directors' meeting June 2, 1952, at which Underhill and William Lawin were present, Lawin submitted a proposal by the Long Prairie Commercial Club offering to subscribe "to the purchase of Guarantee fund surplus certificates of the Company in amounts to a total sum of $20,000.00" with a view to getting the company to move to Long Prairie. The proposal was discussed at length. On motion of Underhill

the proposal was adopted and a committee appointed to negotiate with the club, further action to be taken within 6 months upon recommendations of the committee.

At a board meeting August 4, 1952, Underhill and William Lawin being present, Lawin reported that $20,000 "has been raised for the purchase of Guarantee Fund surplus certificates in the Company."

At a board meeting January 22, 1953, with William Lawin present, L. C. Dixon was elected a director and appointed general manager, the board was expanded to nine directors, and appellants Arthur Lawin, Donald Hart, and F. E. Houle were elected directors.

Thus, as of January 22, 1953, all appellants were on the board of directors, and they continued on the board during all times material herein. Sale of guaranty fund certificates to plaintiff occurred in January and March 1954.

At a board meeting March 25, 1953, at which all appellants were present, the board discussed the financial condition of the company, various phases being amplified by L. C. Dixon. It was then that the motion was made to increase the capitalization to $200,000 for the purpose of expanding the television and farm windstorm coverages. The motion was seconded by Underhill and was adopted without a dissenting vote. Thus, all of the appellants authorized or actively helped to launch the sale of the certificates, not to enable the company to comply with the requirements of the law nor to create a guaranty fund for the protection of policyholders of the company, which are the contemplated purposes of guaranty fund certificates under § 66.12. This increase of capitalization was for the purpose of going to the public to obtain money to expand the business.

It is clear from the foregoing that the increased capitalization was to be accomplished by the sale of guaranty fund certificates. The secretary, LeRoy Dixon, so testified and that this was to be brought about by selling certificates; that anyone on the board of directors would be making the sales. Appellant Arthur Lawin, who became a director 2 months before the meeting of March 25, 1953, was present when the $200,000 capitalization was authorized. He understood that this meant that more guaranty fund certificates would have to be

sold and admitted that he remembered that the sale of guaranty fund certificates was discussed at meetings and that he knew that L. C. Dixon had sold certificates. He knew that sales were being made in 1953 and testified:

"Q. So far as you as a director were concerned they had the authority to sell any number to any person?

"A. That is right.

"Q. And therefore to sell to Mrs. Donovan would be in that authority?

"A. I would presume so."

Appellant Donald Hart, who became a director January 22, 1953, testified that he knew of and participated in the adoption of the plan to sell surplus certificates. He testified as follows:

"Q. Those certificate holders, Mr. Hart, who bought certificates between January 22nd, 1953, and March 8th, 1954, from Mr. Lafe Dixon or Mr. Lawin, bought them, did they not, with the authority of you as a board member?

"A. Yes."

Appellant Houle was elected a director January 22, 1953, attended meetings, and was present at the meeting in March 1953, when it was resolved to increase the capital to $200,000. He understood that this was to be done by sale of certificates. He knew that the certificates were being sold with the authority of the board and testified:

"Q. But you, as a director, authorized the sale and issuance of certificates of about $200,000.00?

"A. I went along with that."

Underhill was reelected first vice president and William Lawin was elected second vice president, April 7, 1953. Later at meetings on July 14, 1953, and November 17, 1953, with all appellants present there was full discussion of the company's financial problems.

L. C. Dixon, who was president of the company from June 1953 to December 1955, sold guaranty fund certificates during 1953 and 1954. He indicated that it was not possible for him to remember the

number. He said, however, that he was not the only one who sold for the company.

The board of the company met November 18, 1954, with all appellants present except Underhill. The following took place:

"The Question of completing the sale of Surplus Certificates to the authorized amount of $200,000.00 was brought up by the Chair. A general discussion followed on various ways & means of making the sales. It was generally agreed that all present Certificate-Holders should be given first chance to purchase more, and that sales to our Agency force should be pushed, with the idea that an agent who owns Certificates will be a better agent for this Company because of such ownership. It was agreed by general consent that the Executives plan a special effort to get as many certificates as possible sold before the end of the year."

On December 7, 1954, with all the appellants present, the minutes of the November 18 meeting were read and approved on motion of William Lawin.

A summary of the financial statements of the Consumers Mutual Company for 1952 through 1956 is as follows:

|  | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|
| Assets ......$ | 85,061.25 | $167,248.17 | $196,326.26 | $191,919.81 | $118,913.90 |
| Liabilities | 77,723.56 | 95,674.45 | 145,437.76 | 158,017.95 | 118,821.24 |
| Surplus .... | 7,337.69 | 71,573.72 | 50,888.50 | 33,901.86 | 92.66 |

| Outstanding guaranty fund certif- icates | $100,325.00 | $167,825.00 | $191,375.00 | $191,375.00 | $191,375.00 |

Shortly before trial appellants moved for summary judgment of dismissal. The trial court reserved ruling and trial proceeded. There was no motion for dismissal at the end of plaintiff's evidence. At the end of the trial appellants renewed their motion. At that time the trial court with the acquiescence of appellants ruled that the issues

raised by count one of the complaint as to whether the certificates issued and sold to plaintiff were securities within the purview of Minn. St. c. 80 were issues to be determined by the court. Thereafter it found that the certificates were securities within c. 80. Under Rule 52.01 of Rules of Civil Procedure that finding is not to be set aside unless clearly erroneous.

■ Minn. St. 80.01, subd. 4, defines security as follows:

" 'Security' means and includes any stock, share, bond, note, debenture, commercial paper, evidence of indebtedness, investment contract, interest in or under a profit-sharing or participating agreement or scheme, or beneficial interest in a trust or pretended trust. Any interest in any security shall be deemed a security."

It is apparent that the guaranty fund certificates here involved have so many of the substantial attributes of "stock," "share," "evidence of indebtedness," and "investment contract" that they must fall within any one or more of the foregoing concepts. The certificates provided that "[r]ights under this Certificate shall be as defined in the Minnesota Statutes." Section 66.12 provides that the holder of a guaranty fund certificate has the following powers and rights:

(a) A vote for each $10 investment by him in the certificates; (b) the power to assign the certificate and the right to have the transfer recorded upon the books of the company; (c) the right to receive interest at an agreed rate if there are net profits after all losses, expenses, liabilities, and legal reserves are paid or provided for; and (d) the right to be repaid the amount of the certificate, with any accrued interest, upon liquidation after payment of liquidation expense, any accrued liability, including losses, and unearned premiums. (Any residue after payment to certificate holders is to be distributed to policyholders.)

The power to vote and the power to assign the certificates are similar to powers exercised by a stockholder in any corporation. The conditions upon which a certificate holder is entitled to interest and to repayment upon liquidation are similar to those under which a stockholder receives dividends and shares in the distribution made upon liquidation. Thus, one of these guaranty certificates represented the

proportionate interest of the holder in the corporate enterprise just as "[s]hares represent the proportionate interest of the shareholders in the corporate enterprise." Loth v. Loth, 227 Minn. 387, 396, 35 N. W. (2d) 542, 548, 6 A. L. R. (2d) 176.

It is to be noted that appellants do not argue that the guaranty fund certificates are exempted or excluded by any language in §§ 80.05 or 80.06, which list exempted securities and excluded sales.

Before statutes gave authority, mutual fire insurance companies could not create a guaranty fund. Dwinnell v. Minneapolis Fire & Marine Mutual Ins. Co. 87 Minn. 59, 91 N. W. 266.

L. 1895, c. 175, § 47, provided for a guaranty fund for mutual marine insurance companies, created by subscription, by which subscribers agreed to pay the amount subscribed on demand for use by the company in meeting "losses and expenses." The subscribers were entitled to annual dividends from profits and to reimbursement for sums required to be paid. L. 1907, c. 321, amended R. L. 1905, § 1631 (now Minn. St. 66.08), to provide:

"* * * A mutual fire insurance company may be formed with, or an existing fire insurance company may establish a guaranty fund divided into certificates of ten dollars each, * * *. The certificate holders * * * shall be entitled to an annual dividend of not more than ten (10) per cent on their respective certificates, if the net profits * * * left after all losses, expenses or liabilities, * * * are provided for, shall be sufficient to pay the same; * * *.

"The guaranty fund shall be applied to the payment of losses and expenses when necessary * * *."

Minn. St. 66.12, which appellants claim is authority for the certificates here involved, had its origin in L. 1921, c. 200, which provided conditions under which a mutual insurance company could issue policies without a contingent liability. One condition was that it maintain, over and above its liabilities and the reserves required by law of a stock company, "a guaranty fund available for the payment of losses and expenses at least equal to the capital stock and surplus, if any, required of a like stock insurance company."

Section 4 of L. 1921, c. 200, provided:

"Any director, officer or member of any mutual insurance company, or any other person, may advance to such company, any sum or sums of money necessary for the purpose of its business or to enable it to comply with any requirements of the law * * *."

The foregoing section was amended by L. 1923, c. 159, § 3, to add to the purposes for which money might be advanced:

"* * * the creation in whole or in part of a guaranty fund to enable it to do one or more of the kinds of business specified in section 1 of this act, and also for the creation by a company issuing policies with a contingent liability of a guaranty fund, in such amount as the board of directors shall determine, for the protection of policy holders of such company * * *."

That amendment provided for the issuance to anyone advancing money of a certificate specifying the amount advanced in units of $10 or multiples thereof and providing for assignment, the right to annual interest, the right to vote, and the right, on dissolution, to be paid after payment of expense of liquidation, accrued liability, including losses, and unearned premiums.

It will be found that the analogy between this guaranty fund of a mutual insurance company and the capital fund of an ordinary corporation is recognized in American Mutual F. & D. H. Fire Ins. Co. v. Kvanbeck, 177 Minn. 165, 167, 224 N. W. 851, 852, in which we held that a subscription to the guaranty fund of a mutual fire insurance company was enforceable. This court said:

"* * * The same rule maintains here as in a case of subscription for stock in a corporation. The subscription amounted to an enforceable contract."

It seems clear that so far as rights and powers created are concerned such certificates can be called stocks or shares. They also evidence an indebtedness collectible upon liquidation, with any accrued interest, and with interest payable annually if net profits are sufficient. They contain an obligation to pay principal and interest if prior obligations are paid and they cannot in any sense be said to evidence a gift. It may therefore be said, we think, that these certificates are with-

in the concept, "evidence of indebtedness." We think they are also "investment contracts." Section 66.12 provides in part:

"Each certificate holder of record shall be entitled to one vote in person or by proxy at any meeting of the members of the company *for each $10 investment by him* in the guaranty fund certificates." (Italics supplied.)

This court in State v. Gopher Tire & Rubber Co. 146 Minn. 52, 177 N. W. 937, held that a certificate providing that in consideration of money paid and assistance in promoting sales the holder would share in the profits of the business was a security within the blue sky law. The court went on to say (146 Minn. 56, 177 N. W. 938):

"No case has been called to our attention defining the term 'investment contract.' The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an investment as that word is commonly used and understood. If defendant issued and sold its certificates to purchasers who paid their money, justly expecting to receive an income or profit from the investment, it would seem that the statute should apply. The statute makes specific mention of stock which, properly speaking, is not a security, and follows the enumeration of investments which fall within its scope with the words, 'herein called securities,' indicating that the legislature has not used the term 'securities' in a literal but in a broad sense. In that sense, these certificates may properly be regarded as investment contracts or securities."

It is obvious that the guaranty certificates here involved were sold and that everyone regarded the transactions as sales. We note that the appellants argue that these certificates are not covered by c. 80 because the operation of insurance companies is controlled by the insurance commissioner. We think that a consideration of the statutes makes it clear that securities issued by an insurer are, unless specifically exempted therefrom, governed by the Securities Act. It is true that securities issued by insurance companies were at one time regulated by the insurance commissioner under L. 1913, c. 385. Under that statute, before offering its securities, a company was required to file with the

commissioner of insurance certain information concerning its plan of business, what it intended to sell, its financial condition, etc. The commissioner of insurance could investigate and then either grant or refuse to license the sale. That statute was in effect when the first Securities Act was passed, L. 1917, c. 429, which was "[a]n act to prevent fraud in the sale and disposition of * * * securities." This act created the state Securities Commission and provided regulation. Section 2 exempted "securities * * * of insurance companies under control of the commissioner of insurance complying with chapter 385 General Laws 1913." However, L. 1913, c. 385, was repealed by L. 1919, c. 104. In 1925 a new Securities Act was enacted, L. 1925, c. 192, and except for perpetuation of the Securities Commission, L. 1917, c. 429, was repealed. Thus, as of 1925, the statute making the insurance commissioner supervisor of insurer-issued securities had been repealed, and the exemption of such securities from the Securities Act had been repealed. It is clear that the express exemption of insurance companies in the 1917 act (L. 1917, c. 429) demonstrates that the legislature considered that unless so exempted, insurance companies issuing securities would be subject to the act. When L. 1917, c. 429, was repealed by L. 1925, c. 192, the legislature designedly removed the exempt status of insurers. There was good reason for doing so because the supervision of insurer-issued securities by the insurance commissioner pursuant to L. 1913, c. 385, had been terminated by its repeal. It is to be noted that L. 1925, c. 192, exempted no insurer-issued securities *except policy contracts of insurance companies.* The exemption is now Minn. St. 80.05(7).

In 1941, exemption of some insurer-issued securities was provided by L. 1941, c. 547, § 2. That statute exempted capital shares, outstanding for 5 years, of a corporation having one class of shares and which had been continuously in the insurance business for 20 years, had aggregate capital and surplus of $5,000,000, and had paid dividends of at least 3 percent each of the past 5 years. That is still the law. Minn. St. 80.05(10). Thus, except for insurance policies, only such insurer-issued securities are exempt from the blue sky law. That the legislature had securities of insurance companies in mind when it

enacted c. 80 is evident from its exclusion of insurance policies and the stocks above described.

There is direct testimony in the record that the insurance commissioner did not regulate or supervise the issuance of guaranty fund certificates. The chief examiner of the insurance department of the State of Minnesota testified, and was asked:

"Q. What attention do you give to the ability to pay the guaranty fund certificates?

"A. None."

, Minn. St. 66.12 contains nothing subjecting the issuance of guaranty fund certificates to the supervision or control of the insurance commissioner and therefore it seems clear that the directors of Consumers Mutual could proceed, as they did, to issue these certificates and sell them without prior investigation or approval of the insurance commissioner. Unless there is regulation under c. 80, there is no regulation.

The record contains an affidavit from Albert O. Anderson, chief examiner of the state department of insurance, listing the names of five other mutual companies which have issued guaranty fund certificates in the past. The record also contains a certificate from Arthur Hanson, commissioner of securities, stating that these companies had not registered certificates. That fact proves nothing in the instant case. These companies may have issued certificates only in isolated instances and may have violated the law in issuing them so the affidavit and certificate are of no special help. It is quite significant that the certificate of the commissioner of securities merely stated that five companies had not registered guaranty fund certificates for sale; it does not state that the guaranty fund certificates are not securities, nor that they did not have to be registered, nor that any statute or administrative ruling excluded them from operation of the Securities Act.

The purpose of the Securities Act is tersely explained in State v. Gopher Tire & Rubber Co. 146 Minn. 52, 55, 177 N. W. 937, 938, as follows:

"The purpose of the statute is to protect the public against imposition. * * * It is a proper and needful exercise of the police power

of the state and should not be given a narrow construction, for it was the evident purpose of the legislature to bring within the statute the sale of all securities not specifically exempted. The commission is better qualified than the average investor to ascertain whether any real values lie behind mere paper evidences of value."

See State v. Hofacre, 206 Minn. 167, 173, 288 N. W. 13, 16, wherein the court said:

"* * * To make effective the legislative prohibition against such activities [the sale of fraudulent or speculative securities], courts have uniformly held that we should not place a narrow construction upon such enactments."

We have examined Gutterson v. Pearson, 152 Minn. 482, 189 N. W. 458, 24 A. L. R. 519, cited by appellants, and have concluded that it is not in point.

We reach the conclusion that the trial court correctly held that the guaranty fund certificates sold to plaintiff were securities which had to be registered under the Securities Act prior to sale.

■ The next question is whether appellants are liable as participants aiding in the sale to plaintiff. Plaintiff contends that the submission to the jury of the question, "Were the defendants, Arthur Lawin, Donald Hart, F. E. Houle and N. D. Underhill aware of the sale of guaranty fund certificates at, the time of, or prior to, or within a reasonable time thereafter, to the plaintiff?" could not possibly have prejudiced appellants because this goes to count one, in which plaintiff alleged that the certificates were securities within the purview of c. 80, had not been registered, and were illegally issued and sold. The court, with the acquiescence of appellants, ruled that it would determine the issues raised by this count. Plaintiff contends that under those circumstances the submission could not have harmed appellants. The trial court had repeatedly said it would decide whether the certificates were securities and would not allow the jury to do so. Appellants did not object to decision by the court and did not request submission of issues material to count one, and when plaintiff asked that the issues raised by that count be submitted to the jury either for a general verdict or

a general verdict accompanied by interrogatories, appellants objected.

As a result the only question for review now is whether the trial court's finding of liability is sustained by the evidence and the law as applied by it. Furthermore, we think the interrogatory was proper and the answer thereto is sustained by the evidence. The trial court had already determined that all defendants aided and participated in the sale of the securities generally. The testimony, exhibits, and inferences reasonably deducible from the whole of the evidence clearly sustain the finding by the court and jury that appellants did have knowledge of the sales before they were made, at the time, or thereafter. Appellants do not argue the insufficiency of the evidence to sustain the answer to this interrogatory and they admit that they knew about it after the purchase. We think, therefore, that since the appeal is from the judgment and the court's finding that appellants aided and participated in the sale of the unregistered securities is sustained by the evidence and supports the conclusions of law, appellants' claim that it was error to submit this issue to the jury is without merit.

The case presents an alternative basis to support an affirmance as to William Lawin and N. D. Underhill. The jury found that they were negligent and that their negligence proximately caused plaintiff's loss. Plaintiff would therefore be entitled to an affirmance against them regardless of liability based on the sale of unregistered securities.

Finally we conclude that the finding of liability against all appellants is sustained by the evidence and that the trial court's findings support the conclusions of law and the judgment entered.

Affirmed.