JOANOS, Judge.
Appellant Horace Whigham (Whigham) appeals from an order of final judgment in which the trial court found no culpability, hence no liability, on the part of appellee Helen Muehl. Appellees (the Muehls) raise four issues on cross appeal: (1) whether the trial court erred in finding a fraudulent securities transaction subject to the provisions of section 517.301, Florida Statutes; (2) whether the trial court erred in finding a fraudulent securities transaction under the Securities Exchange Act of 1934; (3) whether the trial court erred in finding Mama’s of North Florida, Inc., liable for fraud; and (4) whether the trial court erred in awarding interest from March 26, 1981. We affirm in part and reverse in part.
On October 31, 1984, Whigham filed a 5-count complaint alleging: Count I — a violation of section 517.301, Florida Statutes, in that defendant Muehl fraudulently induced plaintiff Whigham to invest in Mama’s of North Florida, Inc.; Count II — a violation of section 10(b) of the Securities Exchange Act of 1934; Count III — a violation of fiduciary duty by misrepresentation and concealment of material facts; Count IV — theft in accordance with sections 812.-012 and 812.014, Florida Statutes; and Count V — a violation of section 607.157, Florida Statutes, in that Whigham was refused permission to inspect the books and records of Mama’s of North Florida, Inc.
This case presents the unhappy scenario which sometimes transpires when friends attempt to go into business together. The record reflects that the Whighams and the Muehls had been friends of long standing, and the starting point of this case was the effort of one friend to assist the other during a period of unemployment. Appel-lee Wallace Muehl holds degrees in mechanical engineering and business administration. Prior to his move to Florida, Muehl had been plant operations manager for a company in Nebraska. The company went bankrupt in November 1980, at which time the Muehls and their three younger *1376 children moved to Georgia to live temporarily with an older son.
Until his retirement in 1983, Whigham worked in the international division of a pharmaceutical company. In 1980, when Muehl was undergoing job problems, Whig-ham and his wife lived in Arizona. Muehl called Whigham at Christmas to advise that he [Whigham] would be contacted as a job reference by several of Muehl’s potential employers. During this same conversation, Muehl mentioned that he planned to open a business at Panama City Beach.
Subsequently, in a letter dated March 16, 1981, Muehl proposed the participation of the Whighams in the Panama City venture. In this same letter, Muehl outlined the potential for profit and advanced an investment proposal to the Whighams. Shortly after receipt of Muehl’s letter, Whigham sent Muehl a check for $10,000. On April 8, 1981, Muehl wrote Whigham advising of the progress of construction on the business and outlining the percentage of return the Whighams could expect on their investment. In addition, the letter advised that the Muehls would sign a personal note to protect the Whighams’ interests until such time as the reinvestment plan was completed.
In July 1981, the Muehls wrote to the Whighams, enclosing pictures of the Panama City venture, and referring to a projected opening date of August 1, 1981. In a letter to Whigham dated September 18, 1981, Muehl advised that their accountant had recommended postponement of incorporation of the business until such time as the business enjoyed a good cash flow. In the same letter, the Muehls expressed their intention to give the Whighams a part of the business, regardless of the debt owed to them, as a way of thanking their best friends.
In a letter dated October 3, 1981, Muehl described needed improvements and their costs, as well as the costs of incorporating. On October 8,1981, Whigham sent Muehl a second check, this time for $5,000. Then in November 1981, Muehl went to Nevada, where the Whighams were living, and obtained a radar range and a Jeep pickup truck from the Whighams for use in the business. On this same trip, Whigham gave Muehl another check for $5,000. Throughout the remainder of 1981 and during 1982, the Whighams continued to receive phone calls and letters from the Muehls, partly of a personal nature and partly related to the business. By December 1982 Whigham had provided the Muehls with a total of $25,600 in cash and a $400 radar range.
By mid-1983, according to the evidence, Whigham became concerned about the business and felt a need for some security for the funds he had advanced to the Muehls. He asked to see the books and records, but Muehl gave various reasons not to produce the materials. Whigham tried to set up a meeting with the Muehls, and was finally successful in November 1983. Then in January 1984, Muehl proposed to deliver a promissory note to the Whighams. In February 1984, the promissory note was tendered, but Whigham found the payback terms unacceptable.
On June 12, 1984, Whigham signed an agreement for sale of stock. This agreement contemplated the stock transfer would take place in October 1984. Whig-ham testified that he was led to understand the delay was occasioned by the fact that the business was not yet incorporated. The incorporation had actually been effected in December 1983. Whigham was not apprised of this fact until August 2, 1984, and he did not see a balance sheet until he and his wife asked about it in Mrs. Muehl’s presence. At that time, Mrs. Muehl insisted that the Whighams should be shown the records. The balance sheet indicated the total assets of the corporation were $19,-000. The listed assets consisted principally of cash and inventory, and the land and buildings were not included as corporate assets.
Whigham was disconcerted by the facts revealed in the balance sheet, and on August 4, 1984, he wrote a memorandum to Muehl requesting specific details about the business. According to the evidence, nei *1377 ther Muehl nor his accountant discussed the matter voluntarily with Whigham. The record reflects that Muehl resisted release of his financial statement and bank statements. Muehl testified that he did not provide Whigham with access to the records because Whigham was not a partner in the business. According to Muehl, at the time the stock transfer was discussed, Whigham knew the stock was at a low value. Muehl admitted, however, that Whigham had not seen the records at that time. In response to a question from the trial judge, Muehl acknowledged he had received $26,000 from the Whighams, and said he did not consider the $26,000 a gift, nor did he consider the money an investment in the business.
The record reflects that the Muehls’ accountant had been authorized to provide only the June 1984 statement to Whigham. The record also reflects that Mrs. Muehl was an equal partner in the business when it was first organized. When the business was incorporated, Mrs. Muehl became a stockholder and vice-president. All partnership assets, including real property, were held jointly by Mr. and Mrs. Muehl.
The cause was tried without a jury. At the close of Whigham’s case, the trial court directed a verdict for Muehl on Count IV, the theft count, but denied the motion for directed verdict as to Counts I, II, III, and V.[1] Then in the final judgment, the trial court found that defendants Wallace Muehl and Mama’s of North Florida, Inc. obtained money from Whigham by means of an untrue or misleading statement, and noted particularly the defendants’ failure to disclose the true condition of the business and the failure to advise that the business was already incorporated when the agreement for sale of stock was made. However, the trial court found no culpability on the part of Helen Muehl, and further found that Whigham failed to prove entitlement to recovery on Counts III and V. Thereafter, Whigham’s motion to amend the final judgment was denied, and this appeal ensued.
The business venture undertaken by the Muehls, with financial assistance from appellant, was organized initially as a partnership. It is undisputed, however, that all parties involved in this venture contemplated the formation of a corporation at such point in time that incorporation became financially feasible.
By statute, a partner is accountable for representations made by another partner, when those representations are made within the scope of the partnership.[2] By the same token, a partner is charged with knowledge of partnership affairs, except in circumstances where fraud has been committed on the partnership.[3] In addition, the partnership is liable in the event one partner acting within the course of partnership business, receives and misapplies money or property from a person outside the partnership.[4] Furthermore, all partners are jointly and severally liable for conduct *1378 chargeable to the partnership.[5] Finally, dissolution of a partnership does not, in and of itself, discharge the existing liability of any partner.[6]
Moreover, just as partners are charged with knowledge of and liability for the conduct of a co-partner acting within the scope of the partnership, corporate officers and directors are charged with knowledge of corporate conduct and affairs. For example, in Manatee County Growers’ Association v. Florida Power & Light Company, 113 Fla. 449, 152 So. 181, 185 (1934), the court observed:
It is elementary that directors are charged with full knowledge of the conduct of the affairs of the corporations of which they are members and they cannot be heard to say that they “have nothing to'do with the management of the business.”
This knowledge chargeable to an officer and director in a corporation includes knowledge of matters contained in the corporate books and records. Redstone v. Redstone Lumber & Supply Company, 101 Fla. 226, 133 So. 882 (1931).
The record in this case reflects that Mrs. Muehl was not only an equal partner with her husband in the original business venture, but she also had actual knowledge of the funds transmitted by the Whighams which were used in furtherance of the business venture. Mrs. Muehl was active in the conduct of the business, and personally took care of the family and business banking affairs. Pursuant to sections 620.61 and 620.615, the communications and representations made by Mr. Muehl to Whigham over a two to three year period are imputed to Mrs. Muehl. And under the provisions of section 620.735, the partnership was not discharged from its existing liability to Whigham at the time of incorporation, for the partners became the officers, directors, and shareholders in the family-owned corporation.
Section 517.301, Florida Statutes, provides a comprehensive statement of conduct which is deemed fraudulent when employed in connection with the offer, sale, or purchase of any security.[7] Similar provi *1379 sions are set forth at 17 Code of Federal Regulations, section 240.10b-5, which provides:
s.240.10b-5 Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
In First Virginia Bankshares v. Benson, 559 F.2d 1307 (5th Cir.1977), the court, in analyzing the provisions of Rule 10b-5, said:
A misstatement or omission encompasses patently false statements. Silence, or omission to state a fact, is proscribed only in certain situations: first, where the defendant has a duty to speak, secondly, where the defendant has revealed some relevant, material information even though he had no duty (i.e., a defendant may not deal in half-truths.). In determining whether the duty to speak arises, we consider the relationship between the plaintiff and defendant, the parties’relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant’s awareness of plaintiffs reliance on defendant in making its investment decisions, and defendant’s role in initiating the purchase or sale, (emphasis supplied).
In Kaas v. Privette, 12 Wash.App. 142, 529 P.2d 23 (1974), the court held that a seller may not remain silent concerning the value of corporate assets, and that any statement made about a material fact may be accepted at face value if the statement was made to induce a sale. In considering the effect of silence as opposed to misrepresentation, the court stated:
It is now recognized generally that those facts must be disclosed which are so vital and material to a transaction that if known by one party and not the other, the agreement would be voidable. In such circumstances the failure to disclose the vital facts is fraudulent. 529 P.2d at 28.
See also General Finance Corporation, et al. v. Keystone Credit Corporation, 50 F.2d 872, 877-878 (4th Cir.1931). And in Smith v. Manausa, 385 F.Supp. 443 (E.D.Ky.1974), mod. on other grounds, 535 F.2d 353 (6th Cir.1976), the court found that failure to reveal that the corporation held at best “equitable ownership” over realty listed on its balance sheet constituted half-truths which are proscribed by the anti-fraud legislation. Although, as in the instant case, in Smith v. Manausa there were no overt misstatements, the court concluded the fact that the balance sheet did not reveal that legal title had not been transferred was a material omission which *1380 seriously inflated the worth of the company.
The authorities relied upon by appellees to demonstrate that Mrs. Muehl had no duty to appellant are inapplicable to this case. Harris v. Zeuch, 103 Fla. 183, 137 So. 135 (1931), concerns a contract for sale of land. There, the court found the purchaser had opportunity to protect himself by dealing at “arm’s length” rather than on the basis of friendship. The court stated “[a] court of equity ‘will not protect those who with full opportunity to do so, will not protect themselves.’ ” 137 So. at 138-139. Similarly, a fiduciary relationship does not arise solely on the basis of a casual acquaintance, Morton v. Young, 311 So.2d 755 (Fla. 3rd DCA 1975); and in the absence of fraud inducing one to forbear investigation, “where the means of knowledge are at hand and are equally available to both parties and the subject matter is equally open to inspection,” then a party who in fact does not avail himself of the opportunity to investigate “will not be heard to say he was deceived by the other’s misrepresentations.” Folz, et ux. v. Beard, 332 So.2d 129, 130 (Fla. 2d DCA 1976).
The foregoing cases are distinguishable, since this record reflects that although Whigham attempted to investigate, he was denied the opportunity to do so. In addition, the relationship between the parties was that of a long-standing friendship rather than that of a casual acquaintance. Finally, the omissions in this case were material because they related to the value of the corporate assets, i.e., the fact that legal title to the realty had not been transferred from the Muehls to the corporation had the effect of artificially inflating Whig-ham’s perception of the value of the business.
Furthermore, under the provisions of section 517.211(2), Florida Statutes, any person who participates in the sale or purchase of a security in violation of the securities laws will be liable to persons damaged by the transaction. See Davis v. Las Ovas Company, 227 U.S. 80, 85-87, 33 S.Ct. 197, 198-99, 57 L.Ed. 426, 430 (1913); Donovan v. Dixon, 261 Minn. 455, 113 N.W.2d 432 (1962); Mary Pickford Company, et al. v. Bayly Bros., Inc., 12 Cal.2d 501, 86 P.2d 102, 108 (1939).
Appellees assert that since Mrs. Muehl did not participate in the transaction, she cannot be liable to Whigham. Although the record reflects that Mrs. Muehl did not request funds from Whigham, it is clear she was active in the organization and ongoing affairs of the business. She did the banking, she was equal partner in the original business and an officer, director and stockholder in the corporation. She knew when the business was incorporated, and she was made aware of Whigham’s efforts to obtain access to the records. In addition, she received the benefit of Whigham’s contributions to the business. We conclude, therefore, that Mrs. Muehl’s conduct comes within the statutory meaning of one who “aided in making the sale” and thus she is subject to the liability imposed by section 517.211(2).
We affirm as to the points raised on cross appeal, but find a brief discussion is in order. First, we are in accord with appellees’ assertion that a section 517.301 action for fraud must be predicated upon a misrepresentation that relates to “a specific material fact that is untrue and known to be so, and stated for the purpose of inducing another to act, upon which statement the other relies in acting to his injury.” Allen v. United Zinc Company, 64 Fla. 171, 60 So. 182 (1912). We note, however, it is well settled that the securities laws are “paternalistic laws enacted by the States under the police powers and are the type of laws that are entitled to vigilant enforcement by the courts, where, ... they are unambiguous and meet constitutional requirements.” Merrill, Lynch, Pierce, Fenner & Smith v. Byrne, 320 So.2d 436 (Fla. 3d DCA 1975).
In this case, appellees contend there was no active misrepresentation; rather, there was a “misunderstanding” about the date of incorporation. Appellees’ contentions notwithstanding, we find the failure *1381 to disclose that incorporation had taken place prior to signing the agreement for sale of stock could be construed as a material misrepresentation. Mr. Muehl attempted to justify his refusal to permit Whigham to examine the records on the ground that Whigham was not a shareholder of record. In the circumstances of this case, denial of access to the records was clearly improper. Thus, we conclude the implicit promise of access to the records served as an added inducement to Whig-ham to purchase the stock.
Second, the elements of an action for fraud pursuant to Rule 10b-5 under 15 U.S.C. § 78j(b) are: “a misrepresentation or omission or other fraudulent device, the plaintiff’s purchase or sale of securities in connection with the fraudulent device, the materiality of the misrepresentation or omission, the plaintiffs justifiable reliance on the device (or due diligence against it), and the plaintiffs damages resulting from the fraudulent device.” Cameron v. Outdoor Resorts of America, Inc., 608 F.2d 187, 193-194 (5th Cir.1979). Scienter, or intent of the defendant to deceive, is an essential element of a Rule 10b-5 claim. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir.1977); Hendrickson v. Westland Mineral Corporation, 463 F.Supp. 826, 828-829 (S.D.Fla.1978). Rule 10b-5 applies to a misstatement or omission only if made in connection with the purchase or sale of a security. However, “[tjhis requirement is given a broad reading, and is satisfied by the showing of a nexus between the defendant’s actions and plaintiff’s purchase or sale.” First Virginia Bankshares, 559 F.2d at 1315. In this case, the Muehls’ knowledge and implied intent to deceive are evidenced, inter alia, by the incorporation effected shortly after Whigham’s insistence on security for his funds and access to the records.
Third, appellees contend the trial court erred in holding the corporation liable for fraud. The argument advanced on this point is that the majority of the stockholders were unaware of any fraudulent activity. Appellees cite Ruden v. Medalie, 294 So.2d 403 (Fla. 3d DCA 1974) for the proposition that in order to hold a corporation liable in a fraudulent securities transaction, a plaintiff must show that a director, officer, or agent of the corporation personally participated in aiding or making the sale.
The record in this case is clear, however, that Mr. Muehl is president, director, and shareholder in Mama’s of North Florida, Inc. The record is also clear that Mr. Muehl negotiated with Whigham an agreement for sale of stock in the corporation, and that agreement was in effect a fraudulent device designed to still Whigham’s insistence upon security for his funds and an accounting. Therefore, we find no error with regard to the finding of corporate liability.
Fourth, appellees assert the trial court erred in awarding interest dating back to March 1981, since the sale of the security occurred in June 1984. The remedies available to a buyer (or seller) in cases of unlawful sale of securities are set forth at section 517.211, Florida Statutes, which provides in relevant part:
517.211 Remedies available in cases of unlawful sale.—
(1) Every sale made in violation of either s.517.07 or s.517.12 may be rescinded at the election of the purchaser, and the person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, shall be jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security. No purchaser otherwise entitled shall have the benefit of this subsection who has refused or failed, within 30 days of receipt, to accept an offer made in writing by the seller, if the purchaser has not sold the security, to take back the security in question and to refund the full amount paid by the purchaser or, if the purchaser has sold the security, to *1382 pay the purchaser an amount equal to the difference between the amount paid for the security and the amount received by the purchaser on the sale of the security, together, in either case, with interest on the full amount paid for the security by the purchaser at the legal rate for the period from the date of payment by the purchaser to the date of repayment, less the amount of any income received by the purchaser on the security.
(2) Any person purchasing or selling a security in violation of s.517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, shall be jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.
(3) In an action for rescission:
(a) A purchaser may recover the consideration paid for the security, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security upon tender of the security.
(b) A seller may recover the security upon tender of the consideration paid for the security, plus interest at the legal rate, less the amount of any income received by the defendant on the security.
(4) In an action for damages brought by a purchaser of a security, the plaintiff shall recover an amount equal to the difference between:
(a) The consideration paid for the security, plus interest thereon at the legal rate from the date of purchase; and
(b) The value of the security at the time it was disposed of by the plaintiff, plus the amount of any income received on the security by the plaintiff.
Implicit in the trial court's award of interest from March 1981 until June 12, 1984, the date of the agreement for sale of stock, was the finding that the funds transmitted by Whigham were contemplated by the parties as funds for investment in the corporation which was ultimately formed. Viewed in this light, the interest award is within the time provisions of section 517.-211(1) when read in conjunction with section 517.21 l(4)(a).
Accordingly, we reverse those portions of the final judgment which find no culpability, hence no liability, on the part of Helen Muehl. In all other respects, the order of final judgment is affirmed.
MILLS and SHIVERS, JJ., concur.

. The appropriate motion in a nonjury trial is a motion to dismiss pursuant to Fla.R.Civ.P. 1.420(b).

. s.620.61, Fla.Stat. (1983), provides:
620.61 Partnership bound by admission of partner. —An admission or representation made by any partner concerning partnership affairs within the scope of his authority is evidence against the partnership.

. s.620.615, Fla.Stat. (1983), provides:
620.615 Partnership charged with knowledge of or notice. —Notice to any partner of a matter concerning partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

. s.620.625, Fla.Stat. (1983), provides:
620.625 Partnership bound by partner’s breach of trust. —The partnership is bound to make good the loss:
(1) When one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and
(2) When the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by a partner while it is in the custody of the partnership.

. s.620.63, Fla.Stat. (1983), provides:
620.63 Nature of partner’s liability. — All partners are liable:
(1) Jointly and severally for everything chargeable to the partnership under ss.620.62 and 620.625.
(2) Jointly for all other debts and obligations of the partnership; but a partner may enter into a separate obligation to perform a partnership contract.

. s.620.735, Fla.Stat. (1983), provides:
620.735 Effect of dissolution on partner's existing liability.—
(1) The dissolution of the partnership of itself does not discharge the existing liability of any partner.
(2) A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business. The agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business.
(3) When a person agrees to assume the existing obligations of a dissolved partnership, the partners whose obligations have been assumed shall be discharged from any liability to any creditor of the partnership who, knowing of the agreement, consents to a material alteration in the nature or time of payment of the obligations.
(4)The individual property of a deceased partner shall be liable for all obligations of the partnership incurred while he was a partner but subject to the prior payment of his separate debts.

. s.517.301, Fla.Stat. (1983), provides:
517.301 Fraudulent transactions; falsification or concealment of facts. —It is unlawful and a violation of the provisions of this chapter for any person:
(1) In connection with the offer, sale, or purchase of any security, including any security exempted under the provisions of s.517.051 and including any security sold in any transaction exempted under the provisions of s.517.061, directly or indirectly:
(a) To employ any device, scheme, or artifice to defraud;
(b) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
(c) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
*1379 (2) To publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.
(3) In any matter within the jurisdiction of the department, to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.