MATTIE HOLZ, SPECIAL ADMINISTRATRIX OF ESTATE OF
CAROLINE A. (ALSO KNOWN AS CARRIE) TETZLOFF,
v. DEAN V. PEARSON AND ANOTHER.[1]

November 18, 1949.

No. 34,909.

[1]Reported in 39 N. W. (2d) 867.

*W. E. Hottinger,* for appellants.

*Stone, Anthony & MacKenzie* and *Arthur E. Anderson,* for repondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or a new trial. The action, one for wrongful death, was brought by the special administratrix of the estate of Caroline A. Tetzloff.

The accident out of which this action arose occurred on October 7, 1946, at about 7:40 a. m. on U. S. Highway No. 169 a few miles south of Le Sueur, Minnesota. Decedent, a pedestrian who had alighted from a northbound bus, was crossing the highway from the east to the west side at a point in the immediate vicinity of the entrance to the Johnson driveway. At a point about four feet west of the center line of the highway, she was struck by an automobile owned by defendant Chester Pearson and driven by his son, defendant Dean V. Pearson, with his father's permission. At the scene of the accident, highway No. 169 extends in a general north-south direction and contains a long, obtuse curve. The Pearson car was traveling south at a speed of about 50 miles per hour and contained,

in addition to the driver, four passengers, three of whom sat in the rear seat, and the fourth occupied the front seat with the driver.

The morning was gray and misty. Defendant Dean testified that the visibility was poorer than usual, but that the road ahead of him was visible for some 700 or 800 feet; that the pavement was wet or damp and that his car skidded when he put on the brakes, but that there was no ice on the highway; that when he reached a point "near the vegetable stand" he first observed a northbound Greyhound bus, still on the shoulder, coming onto the main thoroughfare, a distance of 700 or 800 feet south from him and directly across the highway from where the driveway to the Johnson farm home entered. He estimated the distance from the Johnson driveway to the point where he met the bus at about 75 feet. He said that as he approached the end of the bus he first observed decedent; that she was in the center of the highway 40 or 50 feet behind the bus; that the reason he did not see her before was "because the bus kept shielding her"; that decedent was directly opposite the Johnson driveway, moving toward the farmhouse, "just walking across the road," with her head down. When asked if "she was moving then apparently with care and caution," he answered, "Walking, yes." He testified that the time which elapsed between when he first observed her 40 or 50 feet away from him to the time of the impact was a fraction of a second; that the impact occurred, to the best of his determination, about four feet from the center of the highway in the west lane of the pavement. He further testified in part as follows:

"Q. Don't you suppose that observing a bus stop opposite that driveway the ordinary and prudent person might assume somebody was getting off of that bus?

"A. I don't see why and if they did get off they could wait anyway, you would think.

"Q. You then proceeded after seeing that bus on the assumption first, that no unusual care need be exercised, that you could proceed without taking any precautions, is that right?

"A. That is correct."

There is a conflict in the evidence as to where the car and the bus met and passed. Defendant Dean and Milton W. Swanson, who was riding with him in the front seat, said that it was between 60 and 75 feet north of the Johnson driveway. Dean Fritze and Robert Erickson, students riding in the back seat of the car, were reading when the bus went by, but Dean Fritze said that he "happened to feel the bus go by and somebody hollered, look out, and just as I looked out I could see the bus out of the corner of my eye going by and we hit her." He said that the automobile went about 100 feet after it struck decedent, and that after it pulled off to the side of the road he looked back and the bus had not yet gone as far as the vegetable stand, which he estimated to be about 600 feet from the center of the Johnson driveway. Eugene Fritze, also riding in the back seat, said that as they were passing the Denzer farm he was "glancing" out of the car window to the right, and "all at once I felt the bus pass and I heard, look out, lady, and I looked up and there she was." When questioned as to whether the bus and the car met and passed about 400 feet north of the Johnson driveway, he replied that he could not say for sure, "because I never noticed where we were when we passed the bus," but he said that when he got out of the car after the accident he was sure that the bus was near the vegetable stand.

John H. Anderson, the bus driver, said that it had been raining when he left Mankato on the morning of the accident; that he had been using the windshield wipers, but that he could not remember whether he was using them when he let decedent off the bus; that he stopped the vehicle on the east side of the road almost across from the Johnson driveway; that he was acquainted with decedent only as a passenger on his bus; that she had ridden with him three or four times or possibly more; that his observations of decedent were that she was slow and deliberate in whatever she did; and that her actions that morning in descending from the bus were as usual, that "she was very slow in getting off." When questioned about it, he said that she would have alighted "on the wide place" on the shoulder, and he estimated the width there at between six and eight feet; that

when he stopped the bus the two right wheels were off the pavement, but he was not sure whether the left ones were all the way off. He did not observe decedent's movements after she got off the bus, but said that when he closed the door and started the bus again he looked and she was standing at the side of the road. He later said, "I looked at the mirror on the right side and she was standing on that shoulder, and I put it in gear and started out." He testified that the bus had four speeds and that he thought it was in third gear when he met the Pearson car. From then on he shifted to high gear and proceeded to Le Sueur. He identified Dean Pearson, as he claimed that they met every day on the highway and that he "got to know him that way." He said it was his best recollection that the car and bus met about 400 feet from the point where he let decedent off the bus, and denied that it might have been 100 feet. He did not see the accident, nor did he learn of it until later that day.

Maude Denzer, residing on the next farm north of the Johnson farm, testified that she was looking out of a window that morning in her home right across the driveway from the Johnson farm, close to the driveway; that it was misting, but that she could see the highway; that she observed a Greyhound bus pull up and stop opposite the Johnson driveway and that she saw decedent alight. After the bus departed—she did not know how far it had gone—she saw decedent "coming on the pavement, starting to cross" the road from east to west. The witness was asked on cross-examination if decedent started to cross the highway immediately after the bus got past, and she replied, "Yes, after the bus pulled out. * * * after the bus went she started to go across." She did not say how long after and could not make an estimate as to how far the bus had gone before decedent came onto the pavement and started to cross. The witness, who was eating breakfast in her home, looked away momentarily and did not see the accident, but she next noticed that something unusual had happened when she saw cars stopping on the highway. She then went to the Johnson home and on the way observed decedent lying on the pavement on the right-hand side south of the Johnson driveway.

The principal issues for consideration here are: (1) As to the negligence of defendants and the contributory negligence of decedent; (2) as to the damages to the next of kin in an action brought under § 573.02; and (3) as to the question of excessive damages.

It is our opinion that there is sufficient evidence to sustain the verdict of the jury that defendants, through the driver, were guilty of negligence. While there is a conflict in the testimony as to just where the bus and the car passed on the highway, it was a question for the jury to decide which witnesses it would believe, taking into consideration all the other facts and circumstances as produced by the evidence in the case. If the jury believed that the car and the bus met and passed about 400 feet from where decedent alighted, it might well have considered that the driver of the car had ample opportunity to see decedent.

The jury heard all the testimony and had an opportunity to observe the witnesses and view the scene of the accident at the time of the trial. It was for the jury to determine where the vehicles met on the highway, as well as the other fact questions, and also whether the defendant Dean Pearson was negligent in the manner in which he operated the car. Defendants contend that the testimony of the bus driver was worthless and entitled to no weight, but the trial court in its charge very properly and clearly instructed the jury as to its duty in connection with judging the credibility of the witnesses.

Defendants argue that the verdict is not justified by the evidence and is contrary to law. On an appeal questioning the sufficiency of the evidence to justify the verdict of a jury, it is not necessary for the supreme court to discuss the evidence in detail to demonstrate the correctness of the verdict. Cooper v. Hoeglund, 221 Minn. 446, 22 N. W. (2d) 450; Magnuson v. Burgess, 124 Minn. 374, 145 N. W. 32; 1 Dunnell, Dig. & Supp. § 415a. This court has said in many cases that the evidence will be viewed in the light most favorable to the prevailing party at the trial, Rochester Bread Co. v. Rapinwax Paper Co. 193 Minn. 244, 258 N. W. 302; Ranwick v. Nunan, 202

Minn. 415, 278 N. W. 589; and that the verdict will not be set aside unless it is manifestly and palpably contrary to the evidence. 1 Dunnell, Dig. & Supp. § 415; Solosky v. J. A. Johnson Co. 223 Minn. 390, 27 N. W. (2d) 282; Rivera v. Mandsager, 228 Minn. 227, 36 N. W. (2d) 700. The evidence in the case at bar was such that it was possible for reasonable men to differ, but, since the verdict is supported by the evidence, in the absence of other errors, it must be affirmed.

(b) Defendants contend that, even if it were assumed for the sake of argument that there was some negligence on the part of Dean Pearson, plaintiff still could not recover because of the contributory negligence of decedent. They claim that the evidence proved beyond a doubt that immediately after the bus departed decedent walked behind it onto the highway and thus could not see automobiles coming from the north, the direction from which defendants' car was approaching, because the presence of the bus cut off her vision in that direction. They refer to the testimony of Maude Denzer, plaintiff's witness, as the only eyewitness, but who did not actually see the impact. It is true that Mrs. Denzer was asked on cross-examination if she saw a lady get off a bus and that she answered "Yes." She was then asked if she observed the bus starting out, and she replied, "Yes, it started out." She then testified:

"Q. And then, Mrs. Denzer, immediately after the bus got past—started to—Mrs. Tetzloff started to cross the highway?

"A. Yes, after the bus pulled out.

"Q. She waited—she went from behind the bus?

"A. The bus—after the bus went she started to go across."

She was also asked on direct examination where she first saw decedent when the latter got off the bus, and she answered, "When she started to cross." She was then asked how far the bus was from decedent at that time, and she answered, "The bus had pulled out," but she said that she paid no attention as to how far it had gone—that she could make no estimate. She said that the bus was still in

sight and proceeding on its way toward Le Sueur. It will be observed that the witness did not say how long it was from the time the bus started up before decedent started to cross the road, nor did she say how far it had gone; in fact, she could make no estimate, except that it was still in sight on its way toward Le Sueur.

Here, again, it was a fact question for the jury to determine whether decedent was guilty of contributory negligence, and we cannot say as a matter of law that her conduct was not that of an ordinarily prudent person.

In Heikkinen v. Cashen, 183 Minn. 146, 148, 235 N. W. 879, 880, this court said:

"* * * It is only in the clearest of cases when the facts are undisputed and it is plain that all reasonable men can draw but one conclusion from them that the question of contributory negligence becomes one of law." (Citing cases.)

2 Dunnell, Dig. § 2616, states in part:

"* * * Though contributory negligence on the part of the deceased is a defence there is a presumption that he was in the exercise of due care at the time of the accident. The question of contributory negligence in such cases is always one for the jury, unless the evidence shows such negligence conclusively." (Citing many cases under note 12.)

Defendants cite various cases in support of their contention that decedent was guilty of contributory negligence, particularly Markgraf v. McMillan, 197 Minn. 571, 267 N. W. 515. Inasmuch as each case is determined upon its facts, it is sometimes difficult to find precedents which are squarely in point. We do not feel that the Markgraf case is in point with the instant case. There defendant, operating his automobile south on a country highway at a speed of about 50 to 55 miles an hour, first observed, at a distance of about 600 to 800 feet away, a woman standing on the shoulder of the highway about three feet west of the edge of the pavement, apparently watching for defendant's car and a northbound bus to pass. She made no movement indicating that she intended to cross the pave-

ment or step upon it. At 200 feet away from defendant's car her position had not changed; at 50 feet she had not moved; at 15 feet she made no movement and was in the same position as he drew up to her, "and she was fading out of his vision." As he passed her, the right front door handle of his car caught her arm, throwing her against the side of the car, causing fatal injuries. After a verdict for plaintiff, the case was reversed on the ground of no negligence on the part of defendant, the court saying that defendant had no reason to believe that the woman would move from her position of safety or come into collision with his car.

Here, Dean Pearson first saw the bus standing or moving slowly onto the highway from a point 700 or 800 feet away. He admitted that one of the purposes of stopping a bus is to discharge passengers, and, although driving about 50 miles an hour on a damp or wet highway, that he did not consider that any unusual care needed to be exercised or that it was necessary to take any precautions under the circumstances. These are all matters that must have been considered by the jury in arriving at its verdict.

■ Defendants contend that the trial court erred in admitting over their objections evidence bearing on the nature and value of gifts by decedent to her minor grandchildren.

M. S. A. 573.02, under which this action was brought, provides in part as follows:

"When death is caused by the wrongful act or omission of any person or corporation, the personal representative of the decedent may maintain an action therefor if he might have maintained an action, had he lived, for an injury caused by the same act or omission. The action may be commenced within two years after the act or omission. The damages therein cannot exceed $10,000, and shall be for the exclusive benefit of the surviving spouse and next of kin, to be distributed to them in the same proportion as personal property of persons dying intestate; but funeral expenses and any demand for the support of the decedent other than old age assistance, duly allowed by the probate court, shall first be deducted and paid."

Plaintiff's claim, according to the court's charge, was that decedent was 57 years of age and had a life expectancy of 16 years under the American experience tables of mortality. She was a widow at the time of her death, her husband having died October 19, 1938. She left surviving her a son, Le Ray Tetzloff, married and the father of four children, aged 2, 5, 8, and 9 years, and a daughter, Mattie Holz, married and the mother of two children, aged 7 and 12 years. Le Ray, at the time of the trial and for many years prior thereto, had been employed as a railroad section laborer. He testified that at the time of his mother's death and since about 1941 he had lived in his mother's house at Kasota, with the exception of part of the year 1944, when he resided in St. Peter. He said that he paid no rent to his mother for this house and that the approximate rental value of the place was from $20 to $25 a month. Nor did he pay the taxes or insurance on the house, with the exception of two occasions during this period, as they were paid the rest of the time by decedent. The witness said that after his father died his mother went to Michigan, where she remained until the early part of 1941, and that she then came back and lived with him and his family for a time in the Kasota home. She returned to Michigan for about five months in 1943, but came back to Le Ray's home for a while that year to take care of his wife and help with the housework during an illness of the latter, returning again to Michigan that year. She returned again to Minnesota for a while in 1944, but went back to Michigan again that year, where she remained until about October 1945. While decedent was residing in Michigan she was employed and, according to her son, received compensation varying from $75 a month and board and room at one place to about $200 or $250 a month at another place. Le Ray said that while his mother was residing with him she made no payments for board or room, but that she made certain contributions for the maintenance of the household, including groceries, which he estimated to be of the value of from $2 to $2.50 a week during the school year, when his mother was employed part of the time at the Johnson home, and $20 to $24 for the entire period of the summer months. He further said that

when living with him his mother made other contributions to the household, such as housework, mending, helping with the washing, and watching the children, which he valued at $2 to $2.50 a week during the school year and about $25 a month in the summertime. He also said that his mother "was always buying the children clothes." Defendants objected to this as not being for the next of kin. The witness said that he was in charge of and responsible for his children, and the court overruled the objection. Le Ray then estimated the value of the contributions and gifts made by decedent to his children at between $50 and $60 a year at the least. He said that she took care of his wife for about two or three weeks in 1943 and about six weeks in 1945, when two of his children were born, and that he valued this work at from $13 to $15 a week. In addition, he said that his mother furnished him counsel and advice probably once or twice a month; that he considered this of value to him, but that he was unable to set a monetary value on this advice. In arriving at the figures for the value of her contributions and services, the witness said that he took into consideration the fact that his mother had a room in his house.

Mattie Holz, sister of Le Ray, substantially corroborated his testimony with reference to the various moves the mother made between Michigan and Minnesota after the death of their father, as well as the earnings of the mother while in Michigan. She said that after her mother returned from Detroit in October 1945 and until the date of her death she divided her time somewhat as follows: During the school year from September to June she would spend from Monday until Friday at the Victor Johnson home, where she was employed during the time Mrs. Johnson was engaged in teaching school. On Friday evenings she would come to the home of the witness in St. Peter, usually remaining there until Saturday, and would then go to Le Ray's until Sunday night or Monday morning, when she would again return to the Johnson farm. She testified that between the dates of her father's and mother's deaths the latter gave her money, clothes, motherly advice, and furnished services in her home; that in 1943 her mother took the witness and the latter's

daughter on a six-weeks' trip to Michigan and paid their expenses, including railroad fare; that in 1944 she bought her a coat; in 1945 she paid a dentist bill for her amounting to $50; and that she estimated the value of gifts and contributions up to 1945 at about $50 a year. She said that after 1945, while her mother was working at the Johnsons and would stay at her (Mattie's) home Friday evening and part of Saturday during the school year, the mother helped her at home, as the witness was also employed, and that she valued these services at about $10 a month. During the summer months of this period, she valued the help her mother furnished her at $20 a month. She also said that her mother made contributions and gifts to her children, who were under the care and control of and partially supported by the witness. Defendants again objected to testimony as to gifts made by decedent to her grandchildren, but were overruled. The witness valued the gifts of clothing from decedent to her grandchildren at $25 to $30 a year. She estimated the value of eggs and groceries given to her by decedent during the winter months at about $2 a week, and said that subsequent to 1945 her mother helped her with the canning, house cleaning, and care of the children, bought her some clothes, and furnished her counsel and advice. She said that in estimating the value of the various gifts and services she had taken into consideration the value of the room and board received while her mother stayed with her, and that she still considered the mother's services would be worth at least $10 a month over and above the board and room.

It is our opinion that there was no reversible error on the part of the trial court in admitting testimony as to the services and contributions furnished by decedent to her son and daughter, as well as contributions of necessaries to their minor children, for whose care and support the parents were responsible. It is our opinion that such gifts, contributions, and services as were shown here to have been furnished by decedent were for the benefit of the next of kin within the meaning of the statute, including items of clothing, shoes, and other necessaries furnished by decedent to her grandchildren. These were items which the parents were obligated to furnish, if possible.

In being relieved by decedent of the necessity of furnishing some of them, the parents were necessarily benefited. It is common knowledge, especially during the period of labor shortages and high prices which have prevailed during the past several years, that the contributions of necessaries and services by grandparents to their grandchildren have greatly relieved the duty and responsibility of the parents of such children, ofttimes eliminating want and suffering which might otherwise have occurred.

■ Under the facts and circumstances of the instant case, we cannot say that the verdict of $5,170.50 was excessive, especially in view of the fact that the special damages, including funeral expenses, were $470.50. In numerous cases, this court has recently said that in assessing the amount of damages it is permissible for the jury to consider the present low value of money and the high cost of living. Ranum v. Swenson, 220 Minn. 170, 19 N. W. (2d) 327; Kerzie v. Rodine, 216 Minn. 44, 11 N. W. (2d) 771; Bergstrom v. Frank, 213 Minn. 9, 4 N. W. (2d) 620; Heitman v. City of Lake City, 225 Minn. 117, 30 N. W. (2d) 18.

Affirmed.