NORA A. STALOCH, TRUSTEE FOR HEIRS OF ROSALIND
STALOCH, v. CAROL M. BELSAAS AND OTHERS.

136 N. W. (2d) 92.

June 11, 1965—No. 39,398.

316

*Moonan & Senn* and *F. Martin Senn,* for appellants.

*Eustis, Price, Dunlap & Huisman, John A. McHardy,* and *Robert R. Dunlap,* for plaintiff respondent.

*McLean, Peterson, Sullivan & Etzell* and *Charles T. Peterson,* for defendants respondents.

THOMAS GALLAGHER, JUSTICE.

Action under Minn. St. 573.02[1] for the wrongful death of Rosalind Staloch brought by Nora A. Staloch as trustee for decedent's heirs, against Carol M. Belsaas and Roy Belsaas, her father; and against Greyhound Corporation and Arthur Heiman, its employee. On November 8, 1959, Rosalind, then 16 years of age, met death on Highway No. 14 near Eyota as a result of being struck by an automobile owned by Roy Belsaas and driven by Carol Belsaas. The accident occurred shortly after Rosalind had been discharged as a passenger from a bus belonging to Greyhound Corporation and being operated by Arthur Heiman.

In response to six questions submitted by the court, the jury returned a special verdict wherein it found that plaintiff's decedent, Carol Belsaas, and Heiman had all been guilty of negligence on the occasion of the accident; but that only the negligence of Carol Belsaas[2] had been its proximate cause. Based upon the special verdict and findings of the court, judgment was ordered for plaintiff in the sum of $15,000 against defendants Belsaas. This is an appeal from an order denying their motion for judgment notwithstanding the verdict and amended findings or for a new trial. They contend (1) that the evidence does not sustain a

---

[1] Minn. St. 573.02, subd. 1, provides in part: "When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 2 may maintain an action therefor if the decedent might have maintained an action, had he lived, for an injury caused by such wrongful act or omission. The action may be commenced within three years after the act or omission. The recovery in such action is such an amount as the jury deems fair and just in reference to the pecuniary loss resulting from such death, shall not exceed $25,000, and shall be for the exclusive benefit of the surviving spouse and next of kin * * *."

Minn. St. 573.02, subd. 2, provides in part: "Upon written petition by the surviving spouse or one of the next of kin, the court having jurisdiction of an action falling within the provisions of subdivision 1, shall appoint a suitable and competent person as trustee to commence or continue such action and obtain recovery of damages therein."

[2] Carol Belsaas has married since the accident and her present name is Carol Olson, but for convenience she will be referred to as Carol Belsaas herein.

finding that Carol Belsaas was negligent, or if negligent, that her negligence was the proximate cause of the accident; (2) that as a matter of law the negligence of decedent was a proximate cause of her death; (3) that as a matter of law the negligence of defendant Heiman and Greyhound Corporation was a proximate cause of the accident; (4) that the court erred in its instructions on the issue of proximate cause; and (5) that the court's instructions with respect to §§ 169.14,[3] 169.21,[4] and

---

[3]Minn. St. 169.14, subd. 1, provides: "No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so restricted as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care."

Minn. St. 169.14, subd. 3, provides: "The driver of any vehicle shall, consistent with the requirements, drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, and when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions."

[4]Minn. St. 169.21, subd. 2, provides in part: "Where traffic-control signals are not in place or in operation the driver of a vehicle shall yield the right of way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, but no pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield."

Minn. St. 169.21, subd. 3, provides: "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway.

\* \* \* \* \*

"Notwithstanding the provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and give warning by sounding the horn when necessary and exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

169.32[5] were incorrect under the evidence.

The accident happened about 4:30 p. m. November 8, 1959, at a time when the weather was clear, the sun shining, and the highways dry. At 2 p. m. that date, Rosalind had boarded a bus of Greyhound Corporation at LaCrosse, Wisconsin, for a trip to Eyota. The route followed was over Highway No. 14 which extends westerly from LaCrosse and passes north of Eyota. When the bus neared Eyota, Heiman stopped to discharge Rosalind at the intersection of Highway No. 14 and County Road No. 7. The latter extends north and south through Eyota. This was the first occasion upon which this driver had stopped at this point. On previous trips he had always stopped at the bus depot about 2 blocks south of this intersection. This stop was made on the north shoulder of No. 14 with the left side of the bus from 3 to 6 feet north of the north edge of the concrete pavement on No. 14. In this stationary position, the bus faced west with its right front door just opposite a stop sign which required southbound traffic on County Road No. 7 to stop before proceeding across No. 14. The bus is 35 feet in length and 8 feet in width, and as stopped extended back to about the center of No. 7, leaving sufficient clearance for north or southbound automobiles to pass over No. 14 to the rear of the bus.

Mr. Heiman, the bus driver, testified that just before reaching the intersection he called out the stop for Eyota and then noticed in his rearview mirror that Rosalind was apparently sleeping and did not respond to this call; that after he had stopped the bus he opened its right front

---

[5] Minn. St. 169.32 provides: "Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least 20 feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of 200 feet in each direction upon such highway.

"This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such a manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

door and thereafter walked back in the bus to awaken Rosalind; that when he awakened her, she appeared startled and jumped up and walked toward the front of the bus; that she had left it by the right front door and stepped out onto No. 7 some 14 or 15 feet north of the edge of the concrete on No. 14; that he had then closed the bus door, thereafter observing Rosalind as she walked toward the rear of the bus, and after allowing one westbound car to pass had proceeded to drive back on the concrete on No. 14; that as he proceeded west on No. 14 he saw in the rearview mirror that Rosalind had begun to cross No. 14 and had reached its center when she was struck by an eastbound car; that he had then pulled back onto the right shoulder, stopped and backed toward the intersection, then leaving the bus to see if he could be of any help; that the place where Rosalind had been struck was about the center of No. 14 and somewhat to the east of the center of No. 7; and that she had been struck by the left front fender of the car.

Carol Belsaas testified that just prior to the accident she was driving her father's car east on No. 14; that when she was several blocks west of its intersection with No. 7 she saw the bus parked at the intersection with its right door open; that she was then traveling just under 60 miles per hour; that she then reduced her speed but did not see Rosalind until Rosalind was less than a car length in front of her; that she immediately swerved her car to the right and at the same time applied its brakes; that Rosalind started running toward the south edge of No. 14 and was struck by the Belsaas car when she was within about a step of the edge of the road; and that to the best of Carol's recollection it was the center front of the car which struck her.

Lois Bishop, who was a passenger in the right front seat of the Belsaas car, testified that when she first saw Rosalind, she was walking south at about the center of No. 14 and that the Belsaas car was then from one to two car lengths to the west; that Carol had then sounded the horn and applied the brakes; that the car then veered to the right; that when the horn sounded, Rosalind turned to look and started to run to the south and had then suddenly stopped running and turned to face the Belsaas car which struck her with its right front fender, throwing her into the air and striking her again as it came to a stop.

A police officer who arrived after the accident testified that the impact occurred in the southwest quarter of the intersection; that there were no marked crosswalks at this intersection; and that the Belsaas car had been brought to a stop 91 feet from the point of impact.

Harley Davis, called by defendants Belsaas, testified that he was traveling west on No. 14, following the bus as it approached Eyota at the time of the accident; that he saw the bus stop, with its left side 2 to 3 feet off the concrete, on the north shoulder of No. 14 to the west of the intersection with No. 7; that he then noticed a young lady running along its north side and saw her step onto the highway; that he then applied his brakes and brought his car to a stop; that when she left the north lane of No. 14 he noticed another car approaching from the west on No. 14; that as decedent was crossing No. 14 she was west of the center of No. 7; that he could not swear whether she turned to look to the right or left as she proceeded across the highway; that as the Belsaas car approached he did not notice any change in its direction; that he could not testify where decedent's foot was on the pavement at the moment she was struck but that she was "just back of the intersection a little bit" and to the west of the so-called centerline of the two intersecting roads; and that after the impact the Belsaas car traveled from 80 to 90 feet before stopping.

■ We are of the opinion that the evidence outlined was adequate to support the jury's finding that defendant Carol Belsaas was negligent at the time of the accident and that her negligence was a proximate cause of it. Adopting the version of the testimony most favorable to plaintiff, the jury could conclude therefrom that, after Carol first observed the bus parked at the intersection of Highway No. 14 and County Road No. 7 several blocks east of her as she proceeded east on No. 14, she might reasonably have anticipated that it had stopped at the intersection for the purpose of discharging passengers; and that with this in mind she had failed to exercise reasonable care to avoid striking a discharged passenger who intended to cross from the north to the south side of No. 14. A jury might further find that as she traveled across the intersection she had struck decedent with the right front fender of her car at a point where decedent was only a step from the southerly

edge of No. 14, and accordingly that the impact could have been avoided had this defendant properly controlled her automobile, observed conditions on the highway, and taken reasonable measures to avoid striking the decedent by veering to the left. Under the circumstances, we cannot hold as a matter of law that Carol's negligence was not a proximate cause of the accident. Garey v. Michelsen, 227 Minn. 468, 35 N. W. (2d) 750; LeVasseur v. Minneapolis St. Ry. Co. 221 Minn. 205, 21 N. W. (2d) 522.

■ Likewise, we cannot hold as a matter of law that any negligence on the part of decedent at the time of the accident was a proximate cause of her death. From such evidence the jury might find that after she had been discharged from the bus she had walked along its right side until she had passed beyond it where she turned to her right to proceed across No. 14; that as she commenced to cross from the north to the south edge of the highway the Belsaas car was a substantial distance to the west of the intersection so that she would have adequate time to pass safely to the south side; that she had then proceeded to cross No. 14 and had passed over and beyond its centerline when she first observed that the car had not slowed down and in consequence that she was required to quicken her pace to avoid it; and that she had almost reached the south edge of the pavement on No. 14 before the car struck her. Even though it be held that she was crossing this highway at a point other than at a marked or unmarked crosswalk and was required to yield the right-of-way to motorists using it, this would not establish her negligence as a matter of law nor absolve the defendant driver from exercising due care to avoid colliding with her as prescribed by § 169.21. In our opinion the issue of proximate cause as it related to decedent's negligence was properly submitted to the jury. See, Jasinuk v. Lombard, 189 Minn. 594, 250 N. W. 568; Holz v. Pearson, 229 Minn. 395, 39 N. W. (2d) 867.

■ We cannot hold as a matter of law that the driver of the bus was not negligent in discharging decedent from the bus in such a way that she had to walk to its rear and up to the center of No. 7 before endeavoring to pass over No. 14, the main thoroughfare for east-west traffic. There is nothing to show why the bus could not have been

stopped a length or so forward on the shoulder to avoid the situation described. Further, the evidence discloses that on all previous occasions the bus driver had discharged the passengers at the bus station in Eyota, and there is nothing to show why he could not have done so on this occasion. There is evidence that just before decedent left the bus the driver had awakened her from sleep, from which it might be inferred that he was aware that her faculties were still dulled as she left the bus.

We have held that under ordinary circumstances when a bus driver discharges his passengers in a reasonably safe place the relationship of passenger and carrier ceases therewith. Kieger v. St. Paul City Ry. Co. 216 Minn. 38, 11 N. W. (2d) 757; Ruddy v. Ingebret, 164 Minn. 40, 204 N. W. 630; Reid v. Minneapolis St. Ry. Co. 171 Minn. 31, 213 N. W. 43. However, under the facts here we feel that the jury might properly determine whether the place and circumstances under which decedent was discharged established the driver's negligence as a proximate cause of the accident. Thus, in Patton v. Minneapolis St. Ry. Co. 247 Minn. 368, 370, 77 N. W. (2d) 433, 435, 58 A. L. R. (2d) 921, this court stated:

"While it is true that an adult passenger on a bus or streetcar ceases to be such after he alights therefrom, the carrier's duty of exercising for him the degree of care required of it for its passengers continues thereafter until he has had reasonable opportunity of getting beyond danger from the vehicle's operation or movement, and this duty encompasses the carrier's obligation of exercising reasonable care in selecting a reasonably safe place for the purpose of discharging him, although it is not otherwise responsible for the condition of streets, sidewalks, or boulevard surfaces. [Citing Jacobson v. Omaha & C. B. St. Ry. Co. 109 Neb. 356, 191 N. W. 327, 31 A. L. R. 563; Keator v. Scranton Traction Co. 191 Pa. 102, 43 A. 86, 44 L. R. A. 546; Steinburg v. Milwaukee Elec. Ry. & L. Co. 222 Wis. 37, 266 N. W. 793.]"

See, Gillson v. Osborne, 220 Minn. 122, 19 N. W. (2d) 1.

Of course the situation here would not establish as a matter of law that the negligence of the bus driver was a proximate cause of the acci-

dent, but we feel that the jury could properly determine this issue under proper instructions as to the meaning of the term "proximate cause."

■ With respect to the definition of proximate cause, the trial court instructed the jury as follows:

"* * * The word proximate means *nearest*. The proximate cause of an injury is the *nearest* cause, or, more definitely, is that cause which in the ordinary, natural course of events produced the accident without being interrupted by any efficient and independent cause coming in between.

.    *    *    *    *    *

"A number of circumstances may have more or less to do with causing an accident or an injury. The law, however, seeks to establish the cause that is truly responsible. This is called the legal cause or the proximate cause. As heretofore stated, the word proximate means *nearest*. The proximate cause of an injury is the *nearest* cause, or, more definitely, is that cause which in the ordinary, natural course of events produced the injury without being interrupted by any efficient and independent cause coming in between." (Italics supplied.)

After deliberating for several hours, the jury returned for further instructions with respect to the meaning of this term. The following then occurred:

"The Court: * * * In response to your request the court tells you: A number of circumstances may have been more or less to do with causing an accident or an injury. The law, however, seeks to establish the cause that is truly responsible; that is called the legal cause or the proximate cause. The word proximate means *nearest*. The proximate cause of an injury is the *nearest* cause, or, more definitely, is that cause which in the ordinary, natural course of events produced the injury without being interrupted by any efficient and independent cause coming in between. There may have been several proximate causes for the same accident, but each must meet the test of having produced the injury in the ordinary, natural course of events without having been interrupted and rendered ineffective by the others. They may operate together if they are each a substantial factor in causing the injury.

"Juror: We were wondering in there if we would answer [questions] one, three and five [relating to proximate cause] 'Yes' if that would * * * give each individual the same amount of blame would that be all right or would that be thrown out?

"The Court: You were instructed this morning, and perhaps this instruction would be an answer to the question which you have: This case will now be submitted to you in the form of a special verdict, consisting of seven questions. Your duty will be discharged by making answer to the questions and you will make those answers in writing * * * under the instructions of the court * * *. You are to answer the questions solely upon the evidence received on the trial. * * * You should not concern yourself about whether your answers to the questions will be favorable to one party or any party * * *." (Italics supplied.)

In their motion for a new trial, defendants Belsaas contend that the foregoing instructions were erroneous and since they concern a fundamental question of law, this question is properly before us. See, Strobel v. Chicago, R. I. & P. R. Co. 255 Minn. 201, 96 N. W. (2d) 195. We feel that the instructions quoted may have misled the jury as to the proper legal concept of "proximate cause." This court has held that responsibility as a legal cause for a wrong is not wholly dependent upon sequence in time of the cause of its proximity to the wrong and that instructions to such effect are erroneous. Thus in Campbell v. Railway Transfer Co. 95 Minn. 375, 379, 104 N. W. 547, 549, it was stated that:

"There is no merit in the transfer company's contention that, if any one is liable, it must be the milling company only, because its negligence was the proximate cause of the damage. In point of fact, that negligence was anterior, *but the responsibility as a legal cause in such a case does not depend upon the sequence in time of the wrong charged. * * ** It is not essential that a juridical cause be a sole cause." (Italics supplied.)

Likewise, in Russell v. German Fire Ins. Co. 100 Minn. 528, 534, 111 N. W. 400, 402, it was stated:

"* * * [I]t has been clearly settled by a long line of decisions that

what is meant by proximate cause is not that which is *last in time or place,* not merely that which was in activity at the consummation of the injury, but that which is the procuring, efficient * * * cause." (Italics supplied.)

In Lanasa Fruit S. & I. Co. v. Universal Ins. Co. 302 U. S. 556, 562, 58 S. Ct. 371, 374, 82 L. ed. 422, 426, the United States Supreme Court quoted with approval from Leyland Shipping Co. v. Norwich Union Fire Ins. Society [1918] A. C. 350, 369:

"To treat proxima causa as the cause which is nearest in time is out of the question. Causes are spoken of as if they were as distinct from one another as beads in a row or links in a chain, but—if this metaphysical topic has to be referred to—it is not wholly so. The chain of causation is a handy expression, but the figure is inadequate. Causation is not a chain, but a net. At each point influences, forces, events, precedent and simultaneous, meet; and the radiation from each point extends infinitely. At the point where these various influences meet it is for the judgment as upon a matter of fact to declare which of the causes thus joined at the point of effect was the proximate and which was the remote cause."

In the general discussion of this subject in 38 Am. Jur., Negligence, § 55, it was stated:

"* * * The proximate cause of an injury is not necessarily the immediate cause; not necessarily the cause nearest in time, distance, or space. [Citing American Mutual Lia. Ins. Co. v. Buckley & Co. (3 Cir.) 117 F. (2d) 845.] * * * Thus, by proximate cause is not meant necessarily the last act of cause, or nearest act to the injury * * *. It is only when the causes are independent of each other that the nearest is to be charged with the disaster. Neither contiguity of space nor nearness of time is a test of the causal relation between an act and the injury, but they are merely evidential elements tending to establish such causal relation."

These decisions make it clear that a definition of proximate cause which creates the impression that it is the cause "nearest" to the injury is misleading and erroneous. That it misled the jury in the instant case is manifested by its request for further instructions on this term and its

inquiry as to whether under the court's definition each of the parties might be accorded "the same amount of blame" without jeopardizing the verdict. Since the issue was vital in the litigation, it must follow that the error described will require a new trial on all issues.

■ We find no error in the instructions with respect to Minn. St. 169.14, subd. 1, making it unlawful for a person to drive on a highway at a speed that is greater than reasonable and prudent under the conditions and hazards then existing and which prescribes that speed shall be so restricted as to avoid colliding with any person on the highway in compliance with legal requirements and due care; or with respect to § 169.14, subd. 3, which requires drivers to drive at reduced speed when approaching and crossing an intersection or where special hazards exist with respect to pedestrians; or in its refusal to instruct with respect to § 169.32, which prohibits stopping any vehicle upon the paved or improved part of the highway when it is practical to stop or leave such vehicle off such part of the highway and which related to the conduct of the bus driver in parking his vehicle within the improved or traveled portion of County Road No. 7.

However, we believe that there was error in the court's instructions with respect to § 169.21, subd. 2. The evidence clearly establishes that decedent was crossing Highway No. 14 at a point where there were no "traffic-control signals * * * in place or in operation" and where there were no statutory marked or unmarked crosswalks. Section 169.01, subd. 37, defines a crosswalk as "that portion of a roadway ordinarily included [within] the prolongation or connection of the lateral lines of sidewalks at intersections; * * * any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface." Section 169.01, subd. 33, defines a sidewalk as "that portion of a street between the curb lines, or the lateral lines of a roadway, and the adjacent property lines intended for the use of pedestrians."

Here there was nothing to establish the existence of either a statutory crosswalk or sidewalks at this intersection, and therefore this court's decision in St. George v. Lollis, 209 Minn. 322, 296 N. W. 523, would be applicable. There, in construing the statutory definition of crosswalks (then Mason St. 1940 Supp. § 2720-151[36]) and in construing the

statutory definition of sidewalks (then Mason St. 1940 Supp. § 2720-151[32]) as they relate to § 169.21, subd. 2 (then Mason St. 1940 Supp. § 2720-203[a]), this court stated (209 Minn. 324, 296 N. W. 524):

"* * * Under § 2720-204, pedestrians are required to yield the right of way to all vehicles upon the roadway, if crossing at any point other than within a crosswalk, marked or unmarked.

\* \* \* \* \*

"The external lines of a 'crosswalk' determine the area within which the pedestrian has, and without which the automobilist has, the statutory right of way. * * * It was not the intention of the legislative definition of 'crosswalk' to establish one by fiction where, in fact, no crosswalk was marked on the ground or located by either survey or actual pedestrian use. * * *

"So we hold correct the charge that deceased did not have the right of way in his attempt to cross London Road."

In the instant case the court first instructed the jury that it might find that decedent had the right-of-way under § 169.21, subd. 2, if it determined that she was crossing Highway No. 14 on a crosswalk where no crosswalk existed. Later he instructed it that under § 169.21, subd. 3, a pedestrian crossing a roadway at a point other than a crosswalk must yield the right-of-way to vehicles upon the roadway. Since there was no crosswalk over No. 14, the instructions should have related to the requirements of § 169.21, subd. 3, without reference to § 169.21, subd. 2. Under the instructions given, it seems doubtful if the jury could determine which of these subdivisions was applicable under the evidence submitted. Naylor v. McDonald, 185 Minn. 518, 241 N. W. 674.

Reversed and new trial granted.